UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES E. MCROY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 6756 |
| | ) | |
| COOK COUNTY DEPARTMENT OF | ) | Judge Ruben Castillo |
| CORRECTIONS, MICHAEL SHEEHAN, | ) | |
| in his official capacity, and CALLIE | ) | |
| BAIRD, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This lawsuit raises important issues concerning a citizen's constitutionally-protected right to freely exercise his religious faith. In this particular case, the citizen is an inmate in the Cook County Department of Corrections ("CCDOC"). Plaintiff James E. McRoy has sued Cook County Sheriff Michael Sheahan and former executive director of the Cook County Department of Corrections Callie Baird under 42 U.S.C. § 1983, alleging that they restricted his opportunities to practice his faith and, in doing so, violated his rights under the Free Exercise Clause of the First Amendment.[1] (R. 25, Corrected Am. Compl. ¶ 14.) Specifically, McRoy alleges that prison officials unreasonably and without prior notice canceled services for Muslim inmates, limited the number of services that Muslim inmates could attend each week, and limited the number of

---

[1]     McRoy seeks compensatory and punitive damages as well as injunctive relief. (R. 25, Corrected Am. Compl. at 3-4.) McRoy's complaint contains one count. (Id. ¶¶ 12-15.) The count's heading mentions both "due process" and the First Amendment, but McCroy only alleges that Defendants' actions deprived him of a right "secured by the Constitution in violation of 42 U.S.C. § 1983, specifically the First Amendment right to free exercise of religion." (Id. ¶ 14.) Furthermore, McRoy does not mention due process in his summary judgment response brief. Hence, the only claim at issue in this suit is an alleged violation of McRoy's right to the free exercise of his religion.

Muslim inmates who could attend each service at any given time. (*Id.* ¶¶ 9(a-f).) McRoy also alleges that prison officials subjected Muslim inmates to strip-searches before they could leave their cells to attend services, prohibited imams from bringing religious publications onto the prison's premises, and prohibited Muslim inmates from exclusively living together in one of the prison's living units. (*Id.*) Currently before this Court is Defendants Sheahan and Baird's motion for summary judgment. (R. 34-1.)

Before turning to the substance of this case, we note that McRoy improperly named the CCDOC as a party to this suit. The CCDOC is a non-sueable entity. In order to determine if a defendant is amenable to suit, the federal courts must look to state law. Fed. R. Civ. P. 17(b); *Larsen v. Leak*, 90 C 7289, 1992 WL 5294, at *1 (N.D. Ill. Jan. 9, 1992). To be sued in Illinois, a defendant must have a separate legal existence, either natural or artificial. *Jackson v. Vill. of Rosemont*, 536 N.E.2d 720, 723 (Ill. App. Ct. 1988). The CCDOC does not have such an independent existence.[2] *Mayes v. Elrod*, 470 F.Supp. 1188, 1192 (N.D. Ill. 1979); *see also Givens v. Velasco*, 99 C 6124, 2004 WL 784072, at *4 (N.D. Ill. Jan. 28, 2004); *Larsen*, 1992 WL 5294, at *1. As a result, any theory of liability against the CCDOC must fail.[3] *Id.*

---

[2]     Illinois law provides that the CCDOC is merely a department "created within the office of the Sheriff [of Cook County]," 55 Ill. Comp. Stat. § 5/3-15002 (2004), that its powers and duties are exercised "under the direction of the Sheriff," *id.* § 5/3-15003, and that its executive director serves "at the pleasure of the Sheriff," *id.* § 5/3-15012.

[3]     Even if the CCDOC did have such independent existence, the Defendant CCDOC was never served in this matter, (R. 34, Defs.' Summ. J. Mem. at 2), and thus is not a proper party to this suit.

McRoy is an inmate in Division 11, a maximum-security division within the CCDOC.
(R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 7, 11.) McRoy has been in the CCDOC's custody since
April 21, 2002 and he was transferred to Division 11 in December 2002. (*Id.* ¶¶ 6-7.) After his
incarceration at the CCDOC, McRoy became a practicing adherent to the Muslim faith. (R. 40,
Pl.'s App., Ex. 3, McRoy Dep. at 26.)

CCDOC policy recognizes "its obligation to ensure that inmates are able to practice their
religion as freely as possible" in a manner "consistent with the operational requirements of a
correctional institution." (R. 42, Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 14-16; R. 40, Pl.'s App.,
Ex. 9, General Order 14.14, § I.) Under the prison's policy, "[w]orship services are to be
provided for the residents on a regular basis" and prison employees are prohibited from
"hinder[ing] the religious growth of the inmate under his charge or with whom he has contact."
(R. 42, Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 17-18; R. 40, Pl.'s App., Ex. 9, General Order 14.14,
§§ III(C)(2), III(E).) The policy also specifically addresses the scheduling of religious services,
stipulating that "[w]henever possible, no conflicting activities should be scheduled at the time
essential religious services are being conducted" and that "[s]ervice schedules should be
coordinated with the schedules of other activities of the institution and must be approved by the
Chaplaincy Council." (R. 42, Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 19-20; R. 40, Pl.'s App., Ex. 9,
General Order 14.14, §§ III(C)(2)(b), III(E)(3).)

## A.    Cancellation of Muslim Services

Prison officials in Division 11 maintain a schedule for all religious services which assigns
specific dates and times to specific religious groups. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 56.)

3

The schedule was adopted to limit and better track "non-sworn volunteers"—individuals who were not CCDOC employees—as they moved through the facility. (R. 35, Defs.' Facts, Ex. B, Holmes Dep. at 19.) Muslim services are scheduled in Division 11 to take place from 9-11 a.m. every Monday, Wednesday, and Saturday. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 17; R. 40, Pl.'s App., Ex. 10, Written Policy on Scheduling Religious Services.) These services are led by volunteers who are not employees of the Sheriff's office or the CCDOC. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 18.)

Despite the regularity with which Muslim services are scheduled, these services do not always take place as scheduled. (*Id.* ¶¶ 25, 29, 33.) Monday morning services, for example, did not begin taking place until February 2004 because no Muslim volunteers came to the CCDOC to take advantage of the Monday morning service time slot until that month. (*Id.* ¶ 20.) Similarly, from August 2003 until September 2004, no volunteer imam came to the prison to make use of the Wednesday time set aside for Muslim services. (*Id.* ¶ 21.) From August 2003 until September 2004, Muslim volunteers would appear only "sporadically" for Saturday services.[4]

---

[4] Volunteer imams failed to appear on the following Saturdays: October 4, 2003, October 11, 2003, April 10, 2004, June 19, 2004, June 26, 2004, July 3, 2004, July 10, 2004, and January 3, 2004. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 24.) McRoy's denial that no imam was available on January 3, 2004 is improper for two reasons. First, McRoy disputes the reason for cancellation of services that day rather than the fact that no imam was available. Second, the deposition testimony cited by McRoy supports the proposition that no imam was available on January 3, 2004 because no cancellation appeared in the CCDOC's logbook for that day. Lieutenant Howell—who is a CCDOC officer assigned to Division 11—testified that if a volunteer did not arrive for a scheduled service, he would not have noted the volunteer's absence in the logbook. Howell affirmatively testified that no volunteer was available on January 3, 2004. Howell's statement to McRoy that the January 3, 2004 service was cancelled due to security concerns does not necessarily contradict his testimony that no service took place that day because no imam was available. (R. 40, Pl.'s App., Ex. 2, Howell Dep. at 6, 96-98, 115-16.) As a result, we deem admitted the fact that no volunteer imam was present on January 3, 2004. *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000).

(*Id.* ¶ 22.) On those occasions where a volunteer imam failed to come to the prison, no Muslim services were held. Shift commanders generally —although not always—make a record in their logbook of services that are canceled because a volunteer imam is not available. (*Id.* ¶ 23.) Cancellations are noted in the logbook whether services are canceled by the CCDOC or the religious volunteer, but no notation is made when services do not take place because volunteers fail to show up without any prior communication.[5] (*Id.*)

The shortage of volunteer imams was only one reason for the canceled Muslim services. Division lockdowns and staff shortages also compelled the prison to cancel services.[6] (*Id.* ¶¶ 29, 33.) A division lockdown is a security measure in which all movement within the division is terminated so that prison officials can search the entire prison facility.[7] (*Id.* ¶ 26.) Prison officials try to identify possible security breaches and search for illegal weapons and substances. (*Id.*) During a lockdown, any scheduled activity that requires the movement of inmates within the building—including religious services—are canceled. (*Id.* ¶¶ 28, 29, 30.) Further, religious service providers, such as outside chaplains and volunteer imams, are not allowed into Division 11 on lockdown weekends. (*Id.* ¶ 30.) Until April 2004, CCDOC policy mandated monthly

[5]     McRoy's denial of the facts in paragraph 23 of Defendants' statement of facts does not create a genuine issue of fact. The record evidence McRoy relies on does not contradict the facts as set forth above, for the same reasons cited in note 4, *supra*.

[6]     McRoy disputes that a lack of volunteer imams, a staff shortage, or a division lockdown were the only reasons why Muslim services were canceled by the Defendants, but he alleges no facts providing other reasons why the services would have been canceled. (*Id.* ¶ 25.) McRoy's assertion that Defendants gave inconsistent explanations for cancellations is not supported by his citations to the record, and his reliance on Defendants' failure to note the reason for the cancellation of services on January 3, 2004 is non-responsive. (*Id.*)

[7]     McRoy's denial of this fact is non-responsive and mischaracterizes the cited testimony. (*Id.* (citing R. 40, Pl.'s App., Ex 2, Howell Dep. at 93-95.))

5

division lockdowns at Division 11.[8] (*Id.* ¶ 27.) This policy necessitated the cancellation of Muslim services during seven weekends in 2003 and 2004.[9] (*Id.* ¶¶ 29-31.)

Muslim services were canceled on two additional Saturdays—August 16, 2003 and October 25, 2003—due to prison staff shortages. (*Id.* ¶ 33.) During a staff shortage, prison officials restrict the number of large groups of inmates that can move through the prison.[10] (*Id.* ¶ 32.) Thus, while individuals might be allowed to visit with family during a staff shortage, a group of inmates would not be allowed to leave their tiers to attend a religious service or other group activities. (R. 40, Pl.'s App., Ex. 2, Howell Dep. at 54-56.) In total, from August 2, 2003 through August 28, 2004, Muslim services took place on thirty-one Saturdays.[11] (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 34.)

[8]    Currently, lockdowns occur on an as-needed basis for security reasons. (R. 38, Pl.'s Add'l Facts ¶ 26.)

[9]    Those weekends include August 23-24, 2003, September 6-7, 2003, November 1-2, 2003, December 20-21, 2003, January 24-25, 2004, March 20-21, 2004, and April 3-4, 2004. (*Id.* ¶ 31.)

[10]    McRoy's denies this fact, stating that Howell testified in his deposition that inmates are still allowed to move through the prison during staff shortages. (*Id.* ¶ 32.) In fact, Howell testified that large group movements are canceled during staff shortages, but movements of individual inmates—to meet with a visiting family member, for example—are not canceled because they involve a different type of inmate movement. (*Id.*, citing Pl.'s App., Ex. 2, Howell Dep. at 54-56.) Because McRoy's complaint focuses on the movement of large groups of Muslim inmates into the prison chapel for services, his denial of the fact does not create a genuine issue.

[11]    Muslim services in Division 11 took place on the following Saturdays: August 2, 2003; August 9, 2003; August 30, 2003; September 13, 2003; September 20, 2003; September 27, 2003; October 18, 2003; November 8, 2003; November 15, 2003; November 22, 2003; November 29, 2003; December 6, 2003; December 13, 2003; December 27, 2003; January 10, 2004; January 17, 2004; January 31, 2004; March 6, 2004; March 13, 2004; March 27, 2004; April 17, 2004; April 24, 2004; June 5, 2004; June 12, 2004; July 17, 2004; July 24, 2004; July 31, 2004; August 7, 2004; August 14, 2004; August 21, 2004; and August 28, 2004. (R. 37, Pl.'s Resp. ¶ 34.)

When McRoy was not able to attend services with an imam, prison officials provided alternative means for McRoy to practice his faith. For instance, inmates are permitted to practice their faith with or without the participation of other inmates in their living tier dayrooms.[12] (*Id.* ¶ 16.) Defendants also allow McRoy to keep a soft cover copy of a Bible, Quran, and other religious materials in his cell, where he may pray and study. (*Id.* ¶¶ 14, 15.)

## B. Limitations on Muslim Services

For security purposes, CCDOC policy limits the number of inmates who can attend religious services at any given time. Specifically, prison officials allow only one "pod" of inmates (of the four pods in Division 11) to attend services at a given time.[13] (R. 37, Pl.'s Resp. to Def.'s Facts ¶¶ 57-59; R. 40, Pl.'s App., Ex. 2, Howell Dep. at 62-63.) This practice means that more than one religious service provider from a particular faith must come to the prison during a two-hour period scheduled for that faith's service in order for all the inmates in Division 11 to have the opportunity to attend religious services. For example, because only two hours are allotted for Muslim services on a given day, two volunteer imams would have to come to the prison on a Saturday morning so that all four pods would have the opportunity to attend services. Four separate services of one-hour duration would be performed within the allotted two hours,

---

[12]    McRoy's denial of this fact is improper because he simply states that Defendants never informed him of this option in response to his written grievances. (*Id.* ¶ 16.) He relies on hearsay evidence in the form of his written grievances and their responses to support this denial. Even if that evidence were admissible, however, McRoy's assertion that he was not told of the dayroom communal prayer option does not rebut Defendants' evidence that the option exists. Therefore, we deem admitted the fact that Division 11 inmates are free to practice their religion with other inmates in their living tier dayrooms. *See Malec*, 191 F.R.D. at 584.

[13]    Division 11 of the CCDOC is divided into four "pods" or living units. (R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 12.) Division 11 policy does not allow multiple pods to attend any service or other activity together. (R. 40, Pl.'s App., Ex. 2, Howell Dep. at 62-63.)

two by each Muslim volunteer. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 60.) As a result, on those Saturdays when only one volunteer imam came to Division 11, Muslim inmates in each of the four pods were not all able to attend services. A religious volunteer may receive additional time at the CCDOC if the volunteer seeks prior approval. (*Id.* ¶ 61.)

## C. Strip-Searches of Inmates

For security purposes, all inmates are strip-searched when leaving or returning to the living inmate living area.[14] (*Id.* ¶ 38.) McRoy has been strip-searched before attending religious services and before leaving Division 11 for a court appearance. (*Id.* ¶¶ 40, 44.) The prison's strip-search policy applies to all inmates.[15] (R. 40, Pl.'s App., Ex. 6, Stip Search Policy.)

---

[14]     The CCDOC's written policy states, "All inmates returning to Division 11 from other areas of the Cook County Department of Corrections (CCDOC) or outside the CCDOC must be strip searched and all clothing examined prior to being returned to their living unit." (R. 40, Pl.'s App., Ex. 6, Strip Search Policy.)

[15]     McRoy disputes this fact, alleging that Christian inmates are not strip-searched en route to their religious services. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 39.) McRoy admits, however, that he has no firsthand knowledge that Christian inmates are exempt from the prison's strip search policy. (*Id.* ¶¶ 41, 42, 43.) His allegation that Christian inmates are not strip searched before services is based purely on hearsay. (R. 35, Defs.' Facts, Ex. A, McRoy Dep. at 23-25.) He admits that he is not present when Christian inmates are taken to chapel and that he has no firsthand knowledge of whether Christian inmates were strip-searched. (*Id.* ¶¶ 41, 42.) Further, McRoy admits that his allegation that Christian inmates are not strip-searched before they go to religious services is based "on conversations with random people around Division 11, [whose] names are not . . . known to him." (*Id.* at ¶ 43.) As a result, he has not properly rebutted Defendants' evidence that the strip-search policy applies to all inmates regardless of their religious beliefs. *See Malec*, 191 F.R.D. at 585 ("[A] deposition transcript is not usually admissible at trial but (obviously) may be used in support of summary judgment; but a hearsay statement made during a deposition does not constitute adequate evidentiary support for a factual proposition.").

8

**D.    Pre-Approval of Religious Publications**

Prior to March 19, 2003, the CCDOC had a policy mandating that the prison's Program

Services department first approve all religious materials before they could be brought into

Division 11. On March 19, 2003, the CCDOC formally abandoned this policy.[16] (R. 37, Pl.'s

Resp. to Defs.' Facts ¶ 46; R. 40, Pl.'s App., Ex. 7, Memo on Religious Materials/Literature.)

McRoy is allowed to keep religious materials and publications in his living unit and he has "a

lot" of Islamic materials at his disposal. (R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 14, 47.)

**E.    No Specific Muslim-Only Living Unit**

Division 11 of the CCDOC is divided into four pods, or living units. Each of those pods

has eight living unit tiers. (*Id.* ¶¶ 12-13.) Some of these tiers are designed to serve a particular

segment of the inmate population. Division 11 has, for example, tiers that are age-specific (*e.g.*,

40-and-over, 50-and-over), while others are geared toward inmates with particular medical needs.

(*Id.* ¶ 48.) Two tiers within Division 11 are known as the "life-learning tiers" and are

characterized by their rehabilitative nature. (*Id.* ¶ 49.) Inmates who apply to live in a life-

learning tier must be willing to adhere to a series of rules, such as no smoking and no profanity.

(*Id.* ¶ 50.) Residents of the life-learning tier also abide by compulsory reading hours, during

which many residents of the life learning tier choose to read the Bible. (R. 35, Defs.' Facts, Ex.

---

[16]    McRoy states that imams were prohibited from bringing Muslim religious materials into Division 11 from August 3, 2003 through November 2003, (R. 38, Pl.'s Statement of Additional Material Facts ¶ 13; R. 37, Pl.'s Resp. to Defs.' Facts, Ex. 8, Plaintiff's Answers to Interrogatories at 6), but he presents no admissible facts to support this allegation. When asked how he knows that the imams were prevented from bringing religious material into Division 11, McRoy stated that two imams told him that was the case. (R. 35, Def.'s Facts, Ex. A, McRoy Dep. at 77-78.) McRoy has not submitted any affidavits or deposition testimony from the imams attesting to this fact. Because McRoy's assertion is based solely on hearsay, it does not create a genuine issue of fact for trial. *Malec*, 191 F.R.D. at 585.

C, Plaxico Dep. at 60-61.) The life-learning tier, however, is not specifically tailored for a religious inmate population. (*Id.*, Ex. C, Plaxico Dep. at 60-61; R. 37, Pl.'s Resp. to Defs.' Facts ¶ 50.) Inmates who want to live on an exclusively "religious tier" may be assigned to Tier CJ, a living unit that is open to all religious denominations. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 51, 52.)

## LEGAL STANDARDS

We will grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In resolving a summary judgment motion, the court will neither decide factual disputes nor weigh conflicting evidence, but instead will limit its inquiry to whether a genuine issue of material facts exists for trial. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will consider all facts in the light most favorable to the non-moving party. To avoid summary judgment, however, the nonmoving party must submit competent and specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the evidence presented by the non-moving party is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261 (internal quotation omitted).

## ANALYSIS

McRoy's suit is based upon his belief that CCDOC officials are infringing unconstitutionally on his freedom to exercise his Muslim religion. "Under the Free Exercise Clause of the First Amendment of the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment, no law may prohibit the free exercise of religion." *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 762-63 (7th Cir. 2003), *cert. denied*, 72 U.S.L.W. 3644 (U.S. June 7, 2004) (No. 03-1397). To prevail on a free exercise claim, a plaintiff must first show that some state action burdened his or her exercise of religion. *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989); *Civil Liberties for Urban Believers*, 342 F.3d at 760.

In traditional First Amendment jurisprudence, "religious exercise" can mean: the observation of a central religious belief or practice, *Hernandez*, 490 U.S. at 699, or behaviors and beliefs that are compelled by a particular religion, *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981). The government violates the free exercise clause where it takes action that burdens an individual's practice of his faith by pressuring him to either commit an act forbidden by the religion or by preventing him from engaging in conduct which his faith mandates. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 140-41 (1987). This interference must be more than an inconvenience; the burden must be substantial. *See Thomas*, 450 U.S. at 717-18 (stating that a burden exists when state's regulation puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Graham v. Commissioner*, 822 F.2d 844, 850-51 (9th Cir.1987) (stating that "the burden must be substantial and an interference with a tenet or belief that is central to religious

11

doctrine"), *aff'd sub nom. Hernandez*, 490 U.S. at 680.

The Supreme Court has long recognized an inmate's right to challenge constitutional violations—either related to the practice of their religion or otherwise—and to seek redress for their grievances. In *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Supreme Court wrote that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Because prisoners retain their constitutional rights, "federal courts will discharge their duty to protect constitutional rights" when a prison rule or practice violates a constitutional guarantee. *Id.* (quotation omitted).

As an inmate in a maximum security facility, McRoy certainly has surrendered many of the liberties that he enjoyed prior to his incarceration. The right to regularly pray and worship, however, is not among them. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (stating that "inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise of religion"); *Tarpley v. Allen County, Ind.*, 312 F.3d 895, 898 (7th Cir. 2002) (noting that an inmate's right "freely to exercise his religion does not evaporate entirely when he enters a jail"). Rather, "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *see also Siddiqi v. Leak*, 880 F.2d 904 (7th Cir. 1989).

The Supreme Court also has recognized, however, that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner*, 482 U.S. at 84 (quotation omitted). Because "running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources," it is a task which resides

"peculiarly within the province of the legislative and executive branches of government." *Id.* at 84-85. As a result, courts must adopt "a policy of judicial restraint" when facing issues of prison administration. *Id.* at 85.[17]

In balancing these two competing interests—an inmate's constitutional rights and the state's interest in effectively operating its penal institutions—courts employ a deferential standard of review for prison practices that are alleged to violate constitutional rights. *Id.* at 89. The courts will find the regulation "valid if it is reasonably related to legitimate penological interests." *Id.* When determining whether a prison regulation is reasonable, federal courts apply the four-part test set forth in *Turner. Id.*; *Tarpley*, 312 F.3d at 898; *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999).

Under the *Turner* test, the court first must find that the state has demonstrated "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.*, citing *Block v. Rutherford*, 468 U.S. 576, 586 (1984). Thus, "the governmental objective must be a legitimate and neutral one" and "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

Second, a court must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Where the inmate has "other avenues" to exercise the asserted right, we must "be particularly conscious of the 'measure of judicial deference owed

---

[17]     Federalism considerations also guide the federal judiciary's deference to a prison administration's judgment when a state's penal system is involved. *Id.*

to corrections officials . . . in gauging the validity of the regulation.'" *Id.*, citing *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

Third, a court must consider "the impact accommodation of the asserted constitutional right [would] have on guards and other inmates, and on the allocation of prison resources generally." *Id.* at 90. Because any type of accommodation will affect prison resources in at least some respect, we will be "particularly deferential to the informed discretion of corrections officials" when "accommodation of the asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff." *Id.*

Finally, a court should consider "the absence of ready alternatives" as "evidence of the reasonableness of a prison regulation." *Id.* This is not meant to be a "least restrictive alternative" test. *Id.* Rather, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid, penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

We will apply the four-part *Turner* test to each of the allegations of constitutional violations made by McRoy: (1) cancellation of Muslim services, (2) limitations on Muslim services, (3) strip-searches of inmates, (4) pre-approval of religious publications, and (5) the absence of a Muslim-only living unit.

## I. Cancellation of Muslim Services

During the time period relevant to this litigation, Muslim services in Division 11—along with other religious services and group activities—were canceled as a result of division lockdowns or staff shortages. Additionally, Muslim services did not take place on occasions

14

when no volunteer imam was available to preside over a scheduled service. We will first apply the *Turner* test to the cancellation of religious services when division lockdowns were ordered or when there was a staff shortage in Division 11. We will then address the lack of services on days when volunteer imams were not available.

## A. Division Lockdowns and Staff Shortages

As described above, Defendants have a policy of canceling all religious services—and all group activities—during division lockdowns and staff shortages due to concerns related to prison security. Defendants maintain that the division lockdowns are "justifiable security measures" used to search the prison facility, locate any possible security breaches, and search for illegal contraband. (R. 34, Defs.' Summ. J. Mem. at 5.) Similarly, they argue that they are justified in curtailing detainee movements—particularly large groups of detainees—when prison staff is in short supply. (*Id.* at 6.) Under the first prong of the *Turner* test, we must determine whether Defendants' cited interest is legitimate and whether the cancellation policy is rationally connected to that interest. *Turner*, 482 U.S. at 89.

Given the high level of deference that the *Turner* test affords prison officials, it is difficult for this Court to seriously question the legitimacy of the Defendants' asserted interest in maintaining security during lockdowns and staff shortages and its relationship to the prison's cancellations of religious services during those periods. The Seventh Circuit's decision in *Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir. 1987) provides substantial guidance. In *Hadi*, prison policy mandated the cancellation of Jumu'ah services, which are weekly Muslim congregational services, when those services conflicted with other recreational activities (concerts, picnics, and movies) that had been scheduled by the prison. *Id.* at 787. In analyzing this prison policy under

15

the first prong of the *Turner* test, the Seventh Circuit held that "[t]he cancellations of services in favor of recreational activities were . . . actions in furtherance of an important government interest" because "[m]eeting the recreational needs of prisoners with the concomitant boost to morale and the resulting enhancement of security is a legitimate government interest." *Id.* If the need to schedule recreational activities for prison inmates satisfied the first part of the *Turner* test in *Hadi*, then surely the first prong of the *Turner* test is satisfied here. Defendants' need to ensure the safety of prison inmates and officials during times of heightened security risk—the interest asserted here—is a legitimate one. Further, it is rationally related to the CCDOC policy of canceling religious services and other group activities when division lockdowns and staff shortages occur.

In his brief to this Court, McRoy repeatedly questions the legitimacy of the prison's security concerns, taking issue with the "loose manner" in which the "Defendants employ security as a basis for canceling Muslim services." (R. 39, Pl.'s Summ. J. Resp. at 7.) McRoy argues that the CCDOC's asserted security interests are baseless because "since April 2003, there has been no altercation during any religious service during the relevant time period," a fact that Defendants concede. (*Id.* at 7-8; R. 42, Defs.' Resp. to Pl.'s Add'l Facts ¶ 21.) The Seventh Circuit has made it clear, however, that "prison officials need not wait for a problem to arise before taking steps to minimize security risks." *Hadi*, 830 F.2d at 785; *see also Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132-33 (1977) (stating that "responsible prison officials must be permitted to take reasonable steps to forestall a threat" before the threat is actualized). Similarly, we are in no position to disregard the prison officials' expertise in operating the institutions under their control and in identifying legitimate security concerns.

16

Indeed, McRoy's argument that no violence has occurred during a religious service tends to suggest that CCDOC officials have exercised their discretion wisely. Given the lack of any admissible facts from McRoy to support his allegation that the CCDOC's security concerns are baseless, we find that the Defendants have shown a valid connection between canceling religious services during lockdowns and staff shortages and their legitimate interest in maintaining prison security.

Under the second prong of the *Turner* test, we must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. Here, both Defendants and McRoy agree that when Muslim services are canceled, McRoy is still permitted to pray in his cell using the religious materials he is allowed to keep there as well as to pray in the division's dayroom. As a result, Defendants argue that they have provided McRoy with an alternative avenue by which he can exercise his constitutional right. McRoy, in turn, has not alleged or argued that solitary prayer in his cell or group prayer in the dayroom are insufficient alternatives to communal services for the exercise of his Muslim faith. We therefore find that the Defendants' policy satisfies the second prong of the *Turner* test.

It is important to note that when applying the second prong of the *Turner* test, the courts have not asked prison officials to provide a perfect substitute to the prohibited means of religious exercise. Rather, the courts have recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones*, 433 U.S. at 125 (quotation omitted); *see also Sandin v. Conner*, 515 U.S. 472, 485 (1995). In *O'Lone*, for example, the Supreme Court upheld a prison regulation that precluded prisoners who were part of a work gang detailed on

17

assignments outside the prison from returning to the prison at midday for a weekly Muslim congregational service known as Jumu'ah. 482 U.S. at 345-47. Those inmates were completely denied the opportunity to attend Jumu'ah. *Id.* at 351. In applying the second *Turner* factor in its analysis of the challenged prison regulations, the Court found that, although there were no alternative means for these prisoners to attend Jumu'ah, the prisoners still "retain[ed] the ability to participate in other Muslim religious ceremonies. *Id.* at 351-52. The inmates also remained free to congregate for prayer or discussion. *Id.* at 352. The Supreme Court found that these alternative means of practicing their faith supported the reasonableness of the Jumu'ah-related regulation.

Similarly, in *Hadi*, the Seventh Circuit upheld a prison policy that mandated the cancellation of Jumah when a chaplain was unavailable. 830 F.2d at 784. The Seventh Circuit held that because inmates could still access religious materials in lieu of attending Jumah services (among other opportunities the prison gave Muslim inmates to practice their faith) the prison had provided the inmates with an alternative opportunity to fulfill their religious obligations.[18] *Id.* at 786. The *Hadi* court held that the prison's regulation represented "a much less intrusive burden on the ability of Muslim prisoners to attend Jumah than the policy upheld in *O'Lone.*" *Id.*

Like the inmates in *O'Lone* and *Hadi*, McRoy has alternative means by which to exercise his constitutional rights—namely, the right to pray in his cell using his personal religious

---

[18] The other opportunities that prison officials in *Hadi* gave inmates to exercise their faith included access to a full-time Muslim chaplain, individual ministry to Muslim prisoners, and special arrangements for Muslim prisoners to observe the fast of Ramadan and the feast of 'Id-ul-Fitr. *Id.* at 786. Further, the Muslim prisoners in *Hadi* were given access to religious materials and enjoyed weekly study classes that the prison scheduled for them. *Id.*

materials. McRoy testified that he has "a lot" of Islamic materials at his disposal. (R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 14, 47.) McRoy also has the opportunity to pray with other Muslim inmates in the common area of his living unit. (R. 34, Defs.' Summ. J. Mot. at 12; R. 40, Pl.'s App., Ex. 2, Howell Dep. at 41-42.) McRoy has not alleged that the CCDOC has deprived him of other opportunities to practice his faith (*e.g.*, such as the proper observation of Muslim holy days). As a result, we find that the CCDOC cancellation policy pertaining to lockdowns and staff shortages leaves McRoy with alternative means to exercise his faith and therefore passes scrutiny under the second prong of the *Turner* test.

Under the third prong of the *Turner* test, we must consider "the impact accommodation of the asserted constitutional right [would] have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Defendants have argued that "to accommodate McRoy's request to have religious service during a divisional lockdown or while the facility cancels detainee movement . . . due [to] a lack of staff would cause a great strain on the CCDOC's resources and jeopardize the safety and security of every detainee and staff member." (R. 34, Defs.' Summ. J. Mem. at 6.) The security concerns that prompt division lockdowns or which result from staff shortages would only be exacerbated by a prison policy that allowed groups of inmates to continue to move throughout the institution. McRoy does not dispute—other than by expressing doubt regarding the existence of a security concern—the Defendants' assertion that an accommodation of his request for group services during lockdowns and staff shortages would severely—and adversely—impact the prison's security. (R. 39, Pl.'s Summ. J. Resp. at 7-9.) As a result, the prison's policy of canceling Muslim services during

19

lockdowns and staff shortages to ensure prison security easily satisfies the third prong of the *Turner* test.

Finally, under the fourth prong of the *Turner* test, we consider "the absence of ready alternatives" as "evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. The burden is on McRoy to "point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid, penological interests." *Id.* at 91. McRoy, however, has not proposed any alternative to cancellation of group services during lockdowns and staff shortages. Instead, he simply asks the court to award him compensatory and punitive damages as well as to order Defendants to discontinue their policies. (R. 25, Corrected Am. Compl. at 3-4.) By failing to point to any ready alternatives, McRoy has failed to show the unreasonableness of the prison regulations he challenges. These CCDOC regulations, therefore, satisfy the fourth prong of the *Turner* test.

Because we have found that the CCDOC's policy of canceling religious services during lockdowns and staff shortages meets all four prongs of the *Turner* test, Defendants are entitled to summary judgment on McRoy's claim that this policy is unconstitutional.

## B. Lack of Volunteer Imams

Muslim services do not occur in Division 11 when there are no volunteer imams available to preside over the services. As a result, Monday morning services did not begin taking place until February 2004, when volunteer imams first became available to conduct services at the prison. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 20.) No Wednesday morning services took place from August 2003 through September 2004 due to a lack of volunteer imams. (*Id.* ¶ 21.)

20

Saturday morning services did not take place on eight Saturdays between October 2003 and July 2003 when imams did not appear to conduct services. (*Id.* ¶ 24.)

McRoy argues that Defendants are culpable for the lack of services when imams fail to appear because prison officials are responsible for the shortage of volunteer imams. (R. 39, Pl.'s Summ. J. Resp. at 10-11.) Specifically, McRoy has alleged that prison officials denied the applications of at least three Muslim volunteers. (*Id.* at 10.) McRoy does not allege that these applications were wrongfully denied; rather, he objects that they "were denied without any explanation." (*Id.*) The only support McRoy offers for his allegation of prisoner officials' responsibility is an exhibit consisting of dozens of religious-volunteer applications that were submitted to the prison. (R. 38, Pl.'s Add'l Facts ¶ 5; R. 40, Pl.'s App., Ex. 4, "Religious Volunteer Documents Produced by Defendants on November 3, 2004".) The Court's careful review of Exhibit 4, however, does not support McRoy's broad assertion that prison officials somehow improperly denied the applications of any Muslim volunteers. Thus, Exhibit 4 does not create a genuine issue of fact as to whether prison officials were responsible for the shortage of volunteer imams. *See Malec*, 191 F.R.D. at 585; *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Nor is there any manner to correlate these volunteer applications to any specific cancellations of religious activities. As a result, McRoy has not shown that there is a genuine issue of fact for trial as to whether CCDOC officials improperly denied the applications of Muslim volunteers or otherwise contributed to the shortage of volunteer imams. In fact, Exhibit 4 at best affirmatively shows that prison officials approved many Muslim volunteer applications.

This Court finds that the CCDOC policy of not offering Muslim services when no volunteer imam is available to preside satisfies the first prong of the *Turner* test—the existence of a valid, legitimate objective behind the prison regulation. Defendants have asserted that the cancellation of Muslim services when no imams are available is beyond their control because the imams are volunteers who are not employed by the CCDOC. (R. 34, Defs.' Summ. J. Mot. at 7.) Thus, Defendants' interest in canceling services simply stemmed from the fact that no imam was available to preside. That interest is legitimate because the Seventh Circuit has held that prison officials need not allow inmates to run religious services when no religious service provider is available to preside. *Hadi*, 830 F.2d at 784. In *Hadi*, the Seventh Circuit cited prison officials' concern that "security would be jeopardized by granting inmates positions of authority as religious leaders over other inmates" and "that conflicts might arise because inmates lacked the requisite religious expertise to resolve issues that arose during the religious meeting." *Id.* Because of the legitimacy of these security concerns, the *Hadi* Court held that the prison's policies "did not deprive the plaintiffs of their free exercise under the First Amendment." *Id.* at 784-85. We reach the same conclusion here. Because a legitimate interest underlies the prison's policy of not holding Muslim services when no volunteer imam is available to preside and because the policy and interest are rationally related, this Court finds that the CCDOC policy in question satisfies the first prong of the *Turner* test.

We must also address the remaining three *Turner* factors with respect to the prison's policy of canceling services when no volunteer imam appears. First, as discussed above, McRoy has alternative means through which to exercise his faith—the right to pray in his cell or his living tier's dayroom, using his own religious materials. Second, to change the prison's policy

22

and allow services to continue in the absence of an imam would significantly impact prison resources and could affect prison security. Presumably, more prison guards would have to be deployed to oversee an inmate-led service given the types of conflicts that would likely arise. Finally, McRoy has failed to establish any ready alternatives to the prison's policy of canceling Muslim services when a volunteer imam fails to appear.

In short, the prison's policy satisfies the *Turner* standard. Thus, Defendants are entitled to summary judgment on McRoy's claim that the CCDOC policy of canceling Muslim services when no volunteer imams are available violates McRoy's constitutional right to the free exercise of his religion.

## II.    Limits on Muslim Services

McRoy also challenges a prison policy that limits the number of inmates who can attend any service or activity—religious or otherwise—simultaneously.[19] Specifically, CCDOC policy only allows one "pod" of inmates (of the four pods in Division 11) to attend services at any given

---

[19]    McRoy also alleged that Defendants violated his constitutional rights by "[l]imiting the number of services per week for Muslims." (R. 25, Corrected Am. Compl. ¶ 9(e).) McRoy has not defended that claim in his response brief and it is not clear from the briefs whether this claim is distinct from McRoy's claims regarding cancellations of services. Defendants have submitted competent evidence, however, demonstrating that Muslim services are scheduled to take place in Division 11 three times each week and that a schedule of services was drafted to address CCDOC's security concern about the number of volunteers coming into the facilities at one time. (R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 17, 56; R. 35, Defs.' Facts, Ex. B, Holmes Dep. at 18-21.) Thus we find that Defendants' policy of limiting the number of Muslim services to three each week is rationally related to their legitimate security goal of controlling the number of non-sworn volunteers in Division 11. As discussed above, McRoy has alternate means of exercising his faith on days when services are not scheduled, and accommodating an unlimited number of religious services (if that in fact is what McRoy seeks) could drain CCDOC resources and adversely affect security in Division 11. Finally, McRoy has not suggested any alternate, less limited schedule for Muslim services. For these reasons, we find that Defendants are entitled to summary judgment on McRoy's claim that limiting the number of services per week violates his constitutional rights.

23

time. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 58; R. 40, Pl.'s App., Ex. 2, Howell Dep. at 62-63.) As explained above, this policy requires at least two volunteer imams to come to the prison during the two-hour period set aside for Muslim services every Monday, Wednesday, and Saturday in order to accommodate all four pods in Division 11. Two imams are needed for the scheduled two-hour period because each imam leads two services, lasting one hour each. As a result of this policy, on those days when only one volunteer imam came to Division 11, not every Muslim inmate could attend services.[20]

We find that Defendants' policy of limiting each service to one pod at a time passes the first prong of the *Turner* test because there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation omitted). The CCDOC policy of limiting the number of inmates in attendance at any service—a policy effectuated by not mixing inmates from the four pods for any group activity—is motivated by security concerns. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 56; R. 35, Defs.' Facts, Ex. B, Holmes Dep. at 18-19.) Defendants argue that "keeping the four pods separate is . . . an important security procedure that helps protect detainees, many of whom are designated to specific tiers, such as medical tiers, age-restricted tiers, protective custody and disciplinary segregation tiers, etc." (R. 34, Defs.' Summ. J. Mem. at 12.) They have submitted admissible evidence demonstrating that the limitation on the number of inmates attending religious services was devised to minimize security concerns that arise when too many non-sworn volunteers are moving through the facilities or if inmates from separate pods were to co-

---

[20]     McRoy does not indicate in his brief to this Court how many times he was unable personally to attend services (if any) because of the CCDOC's policy of limiting services to one pod at a time.

24

mingle. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 58; R. 35, Defs.' Facts, Ex. B, Holmes Dep. at 57, 58; R. 40, Pl.'s App., Ex. 2, Howell Dep. at 61-63.) McRoy has not submitted any facts that create a genuine issue regarding the security motivation behind this policy.

As discussed above, Defendants' interest in maintaining security at the CCDOC is certainly legitimate. To require Defendants to relax or abandon their policy limiting the number of inmates who can attend services could have serious repercussions on the prison's administration. Allowing a larger number of inmates to attend services—religious or secular—at a given time would require a significant reallocation of prison staff and resources. It would also heighten security concerns as previously segregated inmate populations intermingle. (*See* R. 40, Pl.'s App., Ex. 2, Howell Dep. at 61-63.) Because we find that there is valid relationship between the CCDOC's expressed security interests and the prison policy of limiting services to one pod at a time, that policy satisfies the first prong of the *Turner* test.

With respect to the remaining prongs of the *Turner* test, we simply note again that McRoy has the option of attending services with members of his own pod and praying in his prison cell or his tier's dayroom with his religious materials. He has not set forth any facts or arguments to suggest why these are insufficient alternatives. Further, the CCDOC policy allows for religious volunteers to request additional time with the inmates with prior approval. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 61; R. 40, Pl.'s App. Ex. 2, Howell Dep. at 41-42.) Under this policy, a volunteer imam who knew in advance that he would be the only imam coming to the prison on a given day could request additional time with the Muslim inmates. Hence, the prison has established other avenues that would allow McRoy to exercise his faith under the leadership of an imam. Also, with respect to the third prong of the Turner test and as discussed above, to force Defendants to

25

relax or abandon their policy limiting the number of inmates who can attend services would have serious repercussions on the prison's administration. Finally, McRoy has not met his burden under the last prong of the *Turner* test of setting forth any ready alternatives, which would allow him to exercise his faith without compromising the CCDOC's penological objectives. (*See* R. 39, Pl.'s Summ. J. Resp. at 12-13.) As a result, he has failed to rebut the reasonableness of the challenged policy.

The prison's policy of limiting the number of inmates in attendance at any activity or service to one pod at a time satisfies the *Turner* test and, therefore, Defendants are entitled to summary judgment on McRoy's claim that this policy violates the Constitution.

## III. Strip-Searches of Inmates

McRoy challenges the prison's policy of strip-searching inmates when leaving or returning to the inmate area. The prison's policy applies to all inmates, regardless of why the prisoner is leaving the inmate area—whether it is to attend religious services in the prison's chapels or to attend a court hearing.[21] (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 39; R. 40, Pl.'s App. Ex. 2, Howell Dep. at 112-13.) McRoy argues that there is no need to strip search Muslim inmates prior to services and that he considers it "to be an act of harassment and totally out of harmony with the act of going to religious services." (R. 39, Pl.'s Summ. J. Resp. at 14.) McRoy does not specify, however, how many times—if ever—he chose not to attend a Muslim service because of the strip-search policy. As a result, he has not shown that the CCDOC's strip-search policy burdened his ability to exercise his religious faith.

---

[21]     For the reasons set forth in note 15, *supra*, McRoy has not effectively rebutted Defendants' evidence that this policy is applied universally.

The CCDOC's policy of strip-searching inmates satisfies all the prongs of the *Turner* test. Strip-searches are used to curb the movement of contraband materials through the institution and, thus, are rationally related to a valid correctional goal: institutional security. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 38.) As the Defendants explained in their motion for summary judgment, strip-searching detainees "stifle[s] and reduce[s] the amounts of weapons and contraband that are manufactured inside CCDOC." (R. 34, Defs.' Summ. J. Mem. at 8.) Failure to strip-search inmates would "cause an increase in the movement of weapons and contraband throughout Division 11, which could potentially cause harm to both detainees and prison staff." (*Id.*) They have submitted competent evidence supporting this argument, which McRoy has not rebutted. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 38; R. 35, Defs.' Facts, Ex. B, Holmes Dep. at 55-56.) Thus, the strip-search policy has a valid and reasonable relationship to the CCDOC's legitimate security interests.

With respect to the remaining prongs of the *Turner* test, as noted above, McRoy has alternative means to pray, even if he were to choose not to attend a Muslim service because of the strip-search policy. Invalidating the prison's strip-search policy would strongly impact the prison's current administration, as prison officials would be forced to find alternative—and less efficient—ways of curbing the manufacture and movement of contraband materials. Finally, McRoy has not met his burden in proposing any ready alternatives to the strip-search policy. (R. 39, Pl.'s Summ. J. Resp. at 14.) For these reasons, the prison's strip-search policy satisfies the *Turner* test, and Defendants are entitled to summary judgment on McRoy's claim that the CCDOC's strip-search policy violates his First Amendment rights.

27

## III. Pre-Approval of Religious Publications

McRoy challenges a former CCDOC policy which mandated that the prison's Program Services department first approve all religious materials before they could be brought into Division 11. (R. 37, Pl.'s Resp. to Defs.' Facts ¶ 46.) Prison officials formally abandoned this policy on March 19, 2003. McRoy disputes this fact, alleging that the policy continued from August 3, 2003 through November 2003, but, as discussed in note 16 *supra*, he presents no admissible facts to support this allegation. Further, McRoy does not deny that he is allowed to keep "a lot of Islamic material" in his prison cell, including a copy of the Quran. (R. 37, Pl.'s Resp. to Defs.' Facts ¶¶ 14, 47.)

McRoy has not demonstrated how the former CCDOC policy burdened his constitutional right to freely exercise his faith—the threshold inquiry in a free exercise violation. *Hernandez*, 490 U.S. at 699; *Civil Liberties for Urban Believers*, 342 F.3d at 760. Specifically, McRoy must allege that the policy burdened the practice of his religion by preventing him from engaging in conduct which his faith mandates—in this case, the study of specific Islamic materials. *Hobbie*, 480 U.S. at 140-41. Further, McRoy must allege that the government's interference represented a substantial burden, not merely an inconvenience. *See Thomas*, 450 U.S. at 717- 18; *Graham*, 822 F.2d at 850-51. In his brief to this Court, McRoy makes the blanket assertion that "although [he] did have access to other religious materials, the prohibition on the distribution of religious materials coupled with the cancellation and restriction of attendance at Muslim services obviously had a serious impact on Plaintiff's exercise of his religious rights." (R. 39, Pl.'s Summ. J. Resp. at 14.) McRoy does not present admissible evidence, however, to show what Islamic materials he was prohibited from possessing, if any. Nor does he state how these

28

materials might be central to the exercise of his faith. McRoy's inability to point to any religious publications that the policy prevented him from receiving coupled with his admission that he has "a lot" of Islamic materials at his disposal demonstrates that there is no genuine issue for trial as to whether the now-defunct policy unconstitutionally infringed upon McRoy's free exercise rights.

McRoy has not submitted competent and specific facts showing that there is a genuine issue for trial on this issue, which is the burden that falls on the nonmoving party in a motion for summary judgment. Fed. R. Civ. P. 56(e). Defendants, therefore, are entitled to summary judgment on McRoy's claim that the CCDOC's policy of pre-screening all religious publications violated his rights under the Free Exercise Clause of the First Amendment.

## IV. Absence of a Muslim-Only Living Unit

Finally, McRoy alleges that prison officials have violated his First Amendment rights under the Free Exercise Clause by not allowing him to live on a Muslim-only living unit tier. A violation of the Free Exercise Clause is predicated on some showing by the plaintiff that the government substantially burdened the practice of his religion by preventing him from engaging in conduct which his faith mandates. *Thomas* at 718. In this case, McRoy has not shown how the CCDOC's decision not to create a Muslim-only living unit has prevented him from behaving in a manner directed by his faith. To the contrary, the evidence shows that McRoy's desire to live on a Muslim-only deck is based less on his religious beliefs and more on his purely personal belief that detainees of different religions should not live on the same deck.[22] (R. 40, Pl.'s App.,

---

[22] McRoy testified: "I don't want to sound bad, but you don't put Jews and Christians together." (*Id.*) When pressed on this point, McRoy continued: "You read the same book, but you get different meanings. We don't even read the Bible. We don't have the same doctrine. So

Ex. 3, McRoy Deposition, at 79.) Because McRoy has not demonstrated how living in an interfaith living unit substantially burdens his ability to freely exercise his Muslim faith, Defendants are entitled to summary judgment on McRoy's claim that the absence of a Muslim-only living unit violates his constitutional rights. Our finding is made all the easier by the fact that McRoy has not even defended this particular claim against the Defendants' motion for summary judgment.

## CONCLUSION

The Court understands McRoy's frustrations in exercising his religious faith. We urge Defendants to voluntarily expand the availability of Muslim services to inmates at the CCDOC. Despite the Court's general empathy for McRoy's situation and his appointed attorneys' valiant efforts, he has not established a genuine issue of material fact that his constitutionally-protected rights to freely exercise his religious faith have been violated by Defendants. Based on the Court's careful review of the admissible evidence in this case, we must grant Defendant Michael Sheahan and Defendant Callie Baird's motion for summary judgment. The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Defendants Sheahan and Baird and against Plaintiff James E. McRoy.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 19, 2005**

having a Christian/Muslim unit doesn't seem ideal, should I say." (*Id.*)

30